which is ITT Corporation v. Lee. Good morning, your honors. May it please the court, my name is Russell Jones and I'm here for the appellant ITT Corporation. What happened here was that the district court ignored the rules that govern the disposition of a 12b6 motion. This court less than two months ago, just a little over two months ago, Doe v. Columbia University, July 29th, outlined the strict rules of how a court is supposed to handle such a motion. Why is it plausible to allege that they didn't do a reasonable investigation of the validity of the patents? In the record, we alleged it is plausible in the record, it's plausible because it was implausible to us that seven years later, Mr. Lee's new company could come up with this idea. It's very plausible because you were saying the patents are in fact valid, right? That's correct. And you were correct. Well, not exactly. Well, didn't the U.S. Patent Office say that you were correct? What happened at the Patent Office, the Patent Office says the Patent Office doesn't say the patent is valid. The Patent Office says the claims that the – that are claims to be invalid, we do not find to be invalid based on the references and the arguments made to us by the challenger. So the challenger is wrong. The challenger is wrong. That doesn't mean the whole patent is valid. It only applies to the claim. And, in fact, isn't he – isn't he a stop? Shouldn't he have been a stop from making that argument in the first place? Because he had made a representation earlier? We would think he would be a stop from making that argument in the first place. But the district court in the Western District didn't do that. So why does the fact that a guy brings a frivolous lawsuit that he is a stopped-from-bringing and that you have established in the Patent Office had no merit whatsoever mean that he must have believed this in good faith because he didn't do research back in the day, years before, that he represented that he did? I mean, isn't it at least as plausible and more plausible that he's just bringing a lawsuit for the – you know, because he's hoping to get away with something? Well, he may have been hoping to get away with something. But, Your Honor, what the contract said was, this was not, as the district court characterized it, a standard rep and warranty, right? This was something very different than a standard rep and warranty. A standard rep and warranty in an IP matter is, we have no – we have no reason to believe that there's anything wrong with these patents. That's the standard rep and warranty. That's not what was done here. We actually – the rep was, we know these patents are valid. And the reason we know they are valid is because Mr. Lee and Mr. Sino and Mr. Foley and the others did an investigation. Right. And on the basis of that investigation, we know that these patents are valid. But we have alleged in the petition, in the complaint – He comes around later – excuse me. Then he comes around later and he lies. And he says it isn't valid. Well – And it turns out that it is a lie because there's no merit to that argument at all. Why does that mean he didn't do an investigation back in the day? And why are you trying to undermine your own patents? Well, we're not trying to undermine our own patent. Your Honor, try this analogy. You go buy a used car. You pay more for a certified used car than you pay for a run-off-the-lot that's as-is. ITT felt it was buying a certified used car in the form of a used car. You did. You got a certification. I'm sorry? You did. You got the certification. It was a lie. It was based on a lie. Why? What makes you say that? Because Mr. Lee and Mr. Foley knew – they knew two things. They knew that the agreement said they had done an investigation. They knew that. Mr. Lee signed it. He knew that. And he also knew that he hadn't. What makes you say that? Your Honor, the straightforward answer has to come from something that is not in this record. And that makes me very nervous. It's not supposed to be that way. But, for example, we know – we knew this after all the briefing was done in this case. We know that Mr. Lee has admitted – or the Kintec has admitted in the other case that Mr. Lee never read, saw, or reviewed that patent. That's an admission in the other case. Yes, sir. You allege in a complaint that the patent, the 367 patent – that's what we're talking about. Right. Right. Issued November 6, 2007. Paragraph 44. If that's the right date, yes. 142 of the appendix. The AR restore recoil damper patent, right? Yeah. Paragraph 44. But do you see that? Yes. The patent – I'm sorry. No, I'm sorry. The date of the patent is November 7, 2006. If you look at 169 in the appendix. If we switch – You look at the actual patent? Yes. It's appendix page 169. And if we switch the date in the complaint, that's – Well, I'm curious, because you alleged it in your complaint that it issued November 6, 2007. Then we missed it by a year. So it was wrong. So it's 2006. Because the agreement was the following summer, then, right? Correct. Correct. The patent was part of the portfolio that was listed in the agreement. And if there was a typo in the complaint, I apologize. We have not noticed that before now. But if you look at page 169 of the appendix. So even without that correction – 169. Even without that correction, say the patent issues November 7, 2006. The agreement's, I think, July 2007? Yes. What was wrong with his investigation if the patent's only six months old? He didn't do one. We've alleged that he didn't do one. We've alleged that – What was he supposed to do? The patent issued six months before. Your Honor, the agreement says – Was he supposed to say the Patent and Trademark Office was wrong in issuing the patent six months before? There would be a question of fact as to whether any investigation that he did was reasonable. We never got to the point of looking at what he did, whether he did anything at all, and whether or not it was reasonable. The reason I ask is this, because you've alleged also that the competing product was as early as 2000, that he should have known about that, right? Absolutely. It was his company's prior product. Right. But there's no allegation that he knew that, right? You haven't alleged that he knew it, that this company was selling this stuff in 2000. Oh. Well, we think it's – not sure if we needed to allege it, but certainly the inference is that Mr. Lee, who started and owned and ran Anodyne, or IMC, which Anodyne was one of his major subsidiaries, that he knew what their companies were selling before this. Well, even if he knew, my point is that the Trademark – the Patent and Trademark Office, six months before, granted a patent for this. They did. They did. And we thought – How is it plausible that he thought that that patent was wrong at the time? That's not the point. The issue, Your Honor, is whether or not he lied when he said he did an investigation. I'm still trying to understand what the damages are from that. I mean, I understand you bought these patents, and you're entitled to a representation that they've investigated this, and these are the – these are legitimate patents. Then this character comes along later and sues you and says, aha, the patent is invalid. Now, I understand you're mad about that, and you should win that case, and you did win that case. And I also understand why you'd want to open up a second front and go after them on, you know, either the patent is valid and we're golden, or you breached your warranty because you must have known that. Fair enough. But now you've established that the patent suit that they brought was invalid, and now you're bringing a lawsuit in which, in public, you are proclaiming that, in fact, they didn't do an investigation. Therefore, our patents are shaky, and everybody's going to think our patents are shaky, and all you're doing is undermining your patents, where, in fact, what you've got is a patent that the patent office has said his claim that they're – it's invalid is wrong, and you've got these certifications. What is – what is the problem? Why are we here? We're here, Your Honor, because not only did IT&T, as we've alleged in paragraph 106 of the complaint, not only did IT&T, we've alleged pay for a certified car where all it got was one off the lot. Therefore, we paid more than we should have paid. That would be a question of fact to be explored in discovery in this case if we're allowed to get there. As we also alleged in the complaint, the damages include the maintenance fees that we're having to do on all these patents, the amount of attorney's fees and time and expense that's been spent in defending the Western District. Well, the maintenance fee is just paying the Patent and Trademark Office, right? You have to pay, like, a license fee every year or something. You have to pay maintenance fees for patents and IP as they go along. They're not – you have to keep them going. So there's that. There's the fact that we paid too much, we alleged, and there's the fact that we've had to pay to defend the Western District case, which has not been cheap and has included having to go to the Patent Office to do all these things. That's – None – That's because he filed a frivolous lawsuit. That's why you had to pay – that's not because he – because there's something wrong with your patents. That's because there never was anything wrong with your patents. If – well, if that lawsuit is determined to be frivolous, which it has not yet been determined to be – we think it is, sure, but we don't know what the Western District judge is going to do with that. If the Western District judge says, you're right, frivolous lawsuit, willful infringement, I'm going to treble all the damages, I'm going to award ITT its attorney's fees, it might do that, but it might not do that, and we don't know for sure. What we do know is that Mr. Lee and Mr. Foley and Mr. Sino knowingly allowed the representation to be made that they had done an investigation where we believe that they did not. What do you have against these other people? Mr. Lee and Mr. – well, Mr. – Other than Mr. Lee, who I understand is now with Kintec and brought this lawsuit, what says – what is the basis for saying that the other people, the other executives didn't do an investigation? Mr. Sino and Mr. Lee – I'm sorry, Mr. Sino was the CEO of Anodyne and a shareholder of IMC. Mr. Foley was the CEO of a sub called Cleveland Control – Cleveland Motion Controls and was also a shareholder of IMC. Mr. Sino and Mr. Foley were named as the people among those who did the investigations. We don't believe that they did. We don't believe that they did the investigations either. Just on information and belief, you think they didn't because you're guessing that they didn't. Your Honor, we've made what we believe are good faith allegations. The testing of those allegations should come in the form of an answer. But what makes it plausible – if somebody gives you a representation and for all you – as far as you know, the validity of the patents, that part of the representation you think is correct, they say they did an investigation and you just say, I'm sorry, I don't believe that anymore. We believed it until they sued us. Until Mr. – no, they – Mr. Lee and his company. Kintec. That's right. Kintec sued us. That's Mr. Lee's new company. So what is the association of the other two defendants with Kintec? I don't believe there is an association. I don't remember if there's an association. So if you have three people make a representation that we did an investigation and one of them Let's say for the moment, one of them it's determined absolutely did not do that. What is the basis for alleging that the other two did not do that? Because one guy is a sinner, the other two must be? Mr. – as I said, Enidine was the owner of this 367 patent. Mr. Sino was the CEO of Enidine. He was also a shareholder. He was also a – I think we've alleged he was a close associate and affiliate with Mr. Lee. To us, it is very plausible that not only did Mr. Lee not do an investigation and yet say that he had, but it's also – it's – frankly, it's at least as likely that Mr. Sino was the one who was supposed to do the investigation about the Enidine patents, which was the 367. He said he did. We would have – we were happy to accept their representation. Where does he – where is there any reason to believe that he did not? There's reason – let's give you, for the sake of this argument, that there is a reason to believe that Lee did not. We believe that Mr. Lee and Mr. Sino were very close. We believe that if there was an investigation done, it's at least as likely that Mr. Sino was supposed to have done it on the Enidine. Was supposed to – of course. Excuse me. It's at least as likely that he was supposed to have done it. What is the basis for saying he didn't do it? You have – you say, not in the record, but I'll accept it for the moment, that Mr. Lee has said, I never did anything. Right. Why does that tell you that Sino never did anything, when you just told me it's at least as likely that it was Sino who was supposed to have done it? We thought everybody had done what they said until the lawsuit was filed in 2014. Mr. – it seems wrong to suggest, without any record or discovery, that there is Well, there was discovery in the patent infringement case, right? I'm sorry? There was discovery in the patent infringement case. There was discovery in the patent – There were depositions made. There has been discovery in the patent infringement case. I'm not counsel in that case, Your Honor. But I – I bet you got copies of the transcripts, though. Yes, and I do not recall whether Mr. Sino has been deposed. I don't know. That case is on – Mr. Lee has, though. Mr. Lee has – Did you get a copy of his transcript? Mr. Lee has not been deposed, no, Your Honor. What happened in the patent case was that there were – we filed the motion to have – to do the reexamination. The other side asked the Western District judge to stay the litigation pending the reexamination. ITT opposed that request. It was granted anyway. And since the reexam was finished, it came back in the district court, and they are in the process of doing discovery in that case. And I believe from my colleague who's shaking his head, they have not deposed Mr. Lee or Mr. Sino or anybody else. So we're just not there yet in that case. I thought you had quoted portions of the depositions in your brief, but I may be wrong about that. I don't believe we – But anyway, you have to reserve some time to rebut. Why don't we hear from your opponent? Thank you, Your Honor. Your Honor, I'd like to start where we finished here, which is a little update on where the Kintec case is. Can you get next to the microphone? I will. You can raise the podium also. There's a little switch there. It might – because you're tall, it might work better. I think I'm okay. You can. Okay. Just to clarify the status of the Kintec case, that case was really preceded through almost no merits-based proceedings because the parties stipulated that they would await the outcome of the ex parte examination before the PTO. So that case resulted in the PTO invalidating the patent, which has ended the merits-based portion of the case. The merits of the – I'm sorry. The PTO invalidated the patent? That's correct. I'm sorry. The PTO – I apologize. The PTO upheld the validity of the patent and rejected my client's arguments or Kintec's arguments. And therefore, this case – there is currently pending no challenge to the patent at issue. Well, wait. When you say there is no challenge pending, I thought the lawsuit is still going on. No. The parties stipulated to be bound by the outcome of the PTO proceeding. So – But – so is there a case pending or not? On the record – on the docket, is there a case that exists or a case – not a case that exists? All that exists is a fight over attorneys' fees. The merits of the case have been fully determined. The parties stipulated that they would abide the outcome of the reexam before the PTO. There's no infringement claim either? It has been destroyed by the parties' stipulation. The parties stipulated that they would do the ex parte reexam and that they would be bound by it. And that stipulation was filed in the court – You see my question, though? You know the difference between validity and infringement, right? So that even if the patent is valid, as the PTO found, right, there can still be the infringement, right? So you're asking are there infringement counterclaims? That's right. I believe there are. Are they still alive? I believe they are. I thought you just said all that's left is the attorneys' fees. I meant as for Kintec's attack on the patent. With regard to Kintec attacking the patent, the only thing that's left is their claim for attorneys' fees. So Kintec and Mr. Lee no longer contend that the patent was invalid? They have lost that. They have lost that. That is over. And it is dead and over. And I think that's important here because there is no longer any possibility that Mr. Lee or that Kintec will be challenging that patent in the future. And that's one of the reasons that Judge Forrest found that there is no damage here because... But is IMC challenging ITT for infringement? Kintec, I'm sorry. Kintec for infringement? No, no. The infringement case is being brought in the other direction. So who's challenging? But there is an infringement case. There is an infringement case against Kintec. Right. Yes. That's pending. And that's still alive? Yes, because the patent has now been agreed by all the parties to be valid and in existence, which was the basis for Judge Forrest's decision that there is no damage in this case, because they have always taken the position that the patent is valid and they have now prevailed on it. So, but Mr. Lee, to get back to this case, made a warrant, warranted that this patent was valid, and then he turned, you disagree with that? We absolutely disagree with that. The section at issue is found in Article III of the contract. Article III of the contract is entitled Representations and Warranties of the Company. Oh, right. I understand. I'm sorry. I misspoke. The company that Mr. Lee was one of the principals of made this representation, and the representation was purportedly based on the knowledge of Mr. Lee and Mr. Kaino and the other, the third guy, whoever he is. Foley. Foley, right. And that was the measure of the knowledge of the company in making this representation. That's correct. Right. So whether or not Mr. Lee could be sued for a breach of warranty because you argue he didn't make one, the company represents that he did this investigation or the three people did this investigation. That's correct. Okay. But then a company that he's a principal of comes along and says, actually, these patents that the company that I was a principal of represented were valid is not valid. Seven years later. Seven years later. Now, why is Mr. Jones wrong that if he says that, that must mean that he didn't, this certainly makes it a plausible allegation that he did not, in fact, do the kind of work that the company represented that he did? First of all, in the intervening time, we've had seven years and nothing is pleaded in the complaint that would allow this court or the court below to draw a conclusion that in the, or to infer, plausibly infer, which I guess is the standard, that additional information didn't come to Mr. Lee's attention in a seven year time frame. This isn't like he brought this case three months, six months, even two years later where the court might infer that he should have had that knowledge earlier. We're talking about a seven year time period, which of course is really the basis for Judge Forrest's decision that this case is time barred six ways to Sunday. So we don't, we don't know whether he had some, we don't know, he may have had a good faith basis for a belief in the Kintec lawsuit that could have come to him after the fact, after the, the investigations were purportedly done back in the day. There's no reason, plausibly alleged, that would allow the court to conclude otherwise. And that's the burden that the plaintiffs have. They have to show this court some reason to believe that this was information that a party had seven years prior. And I would posit that as the years go by, that becomes less and less plausible, and that we're at the outer edge of plausibility and beyond it in this case. Now, we obviously have put forth a couple of other reasons that we think this case has to be dismissed. I mean, the statute of limitations grounds on the contract claims are essentially unrefuted here. The representations at issue were made seven and a half years before this lawsuit was brought. As to the tort claims, we've argued, and we believe, again, no plausible response has been made, that those tort claims are all based on the identical facts that constitute the basis for the contract claims, and therefore, under case law of the New York Court of Appeals and this course as well, they are duplicative and cannot stand. Can I ask you, do you think it goes to the plausibility, the point I raised about the timing of the patent? In other words, the patent's issued in November. The closing is in the following July. Doesn't it go to plausibility whether at that time anybody thought there was something wrong with that patent? I mean, it's one thing if the patent was issued ten years before and you thought it wasn't any good, but the patent is really fresh. Is there any reason to believe that in that six-month period there was some evidence the patent should not have been granted? There's been none alleged, and I'm not aware of any, and I think to the extent that that's a relevant inquiry, and I do think it is, it actually cuts the other way because the prior art at issue here obviously was years before the issuance of this patent, and we have a circumstance here where this patent had just gone through the examination process. When you say the prior art, you mean that they were selling another similar product since 2000, right? Yeah. That's one of the allegations. Seven years. And he should have known about that, so that's why I raise this. I mean, if the patent was issued six months before, doesn't that kind of make it implausible that at the time of the closing somebody knew there was something wrong with the patent? I think it does, and just to be clear, it's not enough that he have known that this prior art product existed. He has to have known that the prior art product existed and that it invalidated the patent, and that goes back to the presentation. Well, but that would go to whether the representation was false that it is a valid patent. It could be a fair representation if he is ignorant of something that undermines it, but the representation that's being an issue here is more than that. It's a representation that he did a proper investigation, and now we're hearing, whether it's in this record that he didn't even look, and certainly he comes around later to the view, apparently, that there was a problem with the patent. That's true, but there's still no allegation that there's any real damage here, because if they take the position that the patent is valid, it's still valid today, and there's no pending challenge. Where did the patent come from, in a sense, when there are inventors listed, none of whom are Mr. Lee and his friends, and then there's an S&E, Enidine, is that one of the IMG companies that's at issue here? It is. And were these people working for, were they employees, is that why it's assigned to the company, or did the company buy this separately from the inventors, do we know? When you say these people, you mean the defendants? Yeah, I'm sorry, the people who are the defendants. So the defendants are Patrick Lee, who owned the holding company of which Enidine was a subsidiary. Yeah, but I'm asking about the relationship between Enidine and the inventors. Is this, in other words, were they employees, is that what? Of Enidine, yes.  So this is basically Enidine's patent. I mean, not only did they, is it a fresh patent, but it's a fresh patent that their company itself, in effect, obtained. That's true. So they're the ones who put this together and went to the patent office and said, we've got a valid patent, and the patent office said, yes. That's correct. Can I just ask you, in your view, does statute of limitations dispose of the whole case? Oh, absolutely, Your Honor. Thank you. You've got three minutes, Mr. Jones. Thank you, Your Honor. So let me start here. As Judge Lynch said, the misrepresentation was not that the, by Mr. Lee and the others, was not that the patent is good. The misrepresentation was, I know it's good because I did an investigation. Again, this is like the certified used car, right? The dealer says, I've checked it out, 20 points. But didn't they do an investigation for sure six months before when they presented the patent? They didn't personally, but it's the company that's at issue. The company is financing this whole operation to get the patent. They presumably did whatever work is necessary. Now, maybe it's a fraud. I don't know. But as far as the patent that you say is valid, that the patent office says is valid, they presented to the patent office everything they need to do to get a patent. That's an investigation in itself, right? Yes, and the important thing to keep in mind is the basis for the alleged invalidity that Mr. Lee's new company made. He didn't say, oh, there was prior art, therefore it's invalid. He went way beyond. They said, this patent was procured by fraud. Our inventors are the people that applied for this patent that worked for me, committed fraud because they knew about all these other products that we had been making. And they knew that this new patented product was just like the others. And so they hid that from the patent office. So Mr. Lee is not saying, oh, we made a mistake. We forgot. He's saying, the Kintec lawsuit alleges, we knew, we hid it, we did it on purpose, we committed fraud on the patent office. We, people that he maybe did not know at the time, he's not saying, I knew when my company was litigating or prosecuting this patent, I knew that it was all a fraud, ha, ha. He's presumably, has to be saying, I was in good faith, he's not admitting that he did a fraud. We don't know what he's saying because he hasn't even had to file an answer yet, and he hasn't been subject to any discovery. Let me quickly deal with the statute of limitations issue, Your Honor, if I may. First of all, what the district judge did wrong, again, was she took the – the district judge took the tort claims, said, these are really contract claims, said, therefore, they're barred by the statute of limitations. Two – two fundamental mistakes. One, of course, is they were not contract claims. They are tort claims allowed by New York law and anticipated as such by the parties' agreement that four times in Section 9.4 carved intentional breach and fraud claims out as being treated separately. So the court was wrong. What the court didn't do was take the claims at face value, as the Columbia University case says the court's supposed to do. But because of actual fraud claims, you have a fairly high standard of pleading for that, right? We pleaded exactly what needed to be pleaded, Your Honor. We pleaded who did it, Mr. Lee and the others. What did he do? He made – he allowed this representation to be made. He knew it was false. He didn't say anything. He kept quiet. We pleaded everything one could possibly. Do you think that's enough to establish actual fraud under 9b? Yes, Your Honor. It is. It is. It's an omission case. It's an omission case. I know something was said. I know it was untrue. I didn't say anything about it. I intentionally didn't say anything about it. That meets 9b. The statute of limitations for the fraud claims, the judge didn't really even talk about them. The statute of limitations for fraud in New York doesn't start to run until all the elements are there, until you know that there's been fraudulent conduct. We didn't know there'd been any fraudulent conduct until 2014. We filed the lawsuit just a few months later. That's an independent fraud claim. She said your fraud claim didn't have what is required to distinguish it from a contract claim. But she was wrong on that, Your Honor, with all due respect to the court. The duty – the New York courts, the New York cases, the Scores case, the Bell Sports case, those courts say that under New York, a breach of contract can rise to a level of breaches of a duty that arises separately from the four corners of the contract. That is what we allege. The duty that was – the duty that was breached here, as I said before, was the duty not to lie, the duty not to let IMC make a warranty that Mr. Lee and we allege the others knew was false because they knew they were – the promise was they did an investigation. They knew they had not done it. That is not a – the duty not to lie is not a duty that arises under the contract. It is a duty that arises under the common law, and the breach of that duty creates fraud. The court did not make an analysis as to whether a fraud claim would be barred by the statute of limitations. And if the court had made that analysis, it would have had to come to the conclusion that it was not barred. The court also glossed over any issues of equitable tolling on – if they are contract claims. We argued why equitable tolling should apply to contract claims. The district court just kind of blew through those. That was the error here. Thank you, Your Honor. Thank you very much.